Good morning. May it please the Court, my name is Robert Steiner. I am counsel for Appellant, Laboratory Corporation of America Holdings in this matter. The district court erred in two significant ways when it entered summary judgment for the plaintiffs in this case adopting the magistrate judge's report and recommendation. First, the court misconstrued well-settled law in North Carolina on the doctrine of mutual mistake when it held that LabCorp was required to point to specific customers that the party plurally agreed to as part of the negotiations to include in the asset purchase agreement but neglected to include. Second, the court failed to consider the record evidence showing that the party's intent all along was to reward PEI, the plaintiff in this case, for growth for those customers it was bringing to the deal And they wrote a contract, didn't they? Absolutely. And they had an addition to the contract, didn't they? They did. And that had a list, didn't it? It did. And these accounts are not part of that list, are they? They are not. And there's no question. There is no question. And it's rare, I think, that a lawyer stands up in front of a court and admits that its client, in this case LabCorp, made the error. There was an error made by LabCorp in failing to include all the customers that it shared with the plaintiffs on the shared customer list. And so, by definition, the mistake is at mutual. I don't agree with that, Your Honor. The case law in North Carolina actually is fairly clear on this point. Well, let me ask it this way. Who would get to decide what names would move? Well, I think when you look at the… Assuming we agree with you. Right. When you look at the chronology here, in terms of how the… Who would get to decide? The trier of fact would decide, whether that be the judge or jury. Well, if there's a factual question, then there's not a mutual mistake, is there? No. I think in every instance, in every instance where you have an allegation of mutual mistake, there is a question of intent. What did the parties intend to accomplish by their written agreement? And does the agreement accomplish what the parties intended? I still don't understand the mutuality of this mistake that concerns you. The mutuality, I think, is in the record. And what the record shows is that the parties were working towards, in this concededly negotiated document, was to achieve a mechanism by which the PAGDU parties would be rewarded for growth in the customers that they were bringing to the deal. Right. But they think they did. I understand that they denied… You create the list. I understand that. And I understand that they deny that the agreement meant anything other than it says. But when you take into account the parole evidence that shows how the deal developed and that from the inception there was this concept that you were going to have a $13 million payment and a $4 million earn out, which was based on growth of the business that they were bringing. But the contract echoes that. There's a whole list of people that are shared customers. And the contract is mistaken. It is mistaken. I think maybe we can go at it from the other end, which was where I think Judge Duncan started. And that is, let's assume that there was to be a reformation of the contract. What would you have the district court do? And how would it get done? Well, I think what the district court would do would determine what the trial of fact would do, whether it be the district court or the jury, would determine what were the parties intending to accomplish. Mr. Klinke… But there's no dispute about what the parties were intending to accomplish. I don't agree, Your Honor. Well, I thought you said there wasn't. I thought you said that the parties mutually intended that LabCorp, that the Paddy's not get credit for the cut. They were to be rewarded for growth in customers. Maybe I've misspoken. Our position is that there actually is no dispute that the parties were trying to reach an agreement that would memorialize the intent, which was that the Paddy's would get credit for customers they were bringing to the deal. The Paddy's obviously, during the course of this litigation, taking different position. Their position is that we wanted exactly what the agreement says, which is not surprising in the context of a claim regarding mutual mistake. So the disputed issue of fact is what the Paddy's say now and what the documentary evidence and the testimony suggest was going on between the parties. Let me point to some specific facts that show that what the parties were trying to accomplish… Excuse me, but if the parties disagree as to what names were to go on the list, that's what it's about, right? At this point… And were to be included, right? I'm not sure I fully understand the question. I think what the parties were trying to do was develop this mechanism whereby the Paddy's would get credit for the customers they were bringing to the transaction. And you say that there was a list, and the list doesn't accurately reflect the names that were to be on it originally, right? That is correct. Now, let's suppose that that has to be decided now. Are you saying that you think the district court has to make that decision about which customers go on that list and which ones don't? I don't think the district court actually needs to make that decision. Well, who makes it then, because that's what the dispute's about. The trial of fact, because there's an issue of… But that's the district court. That is the district court. I can't do it on these papers, though. It would be required to take testimony of the parties. We would be entitled to a trial on the merits where we present what this is, and the district court can then determine… Not a contract written on the back of some piece of paper, but a formal written contract with this attachment with many, many accounts, which was even created by your client. And you're telling me there's now a mutual mistake. I think as you look at the cases, we cite State Trust v. Fresno. What about BB&T v. Chicago Title Insurance? A general intent on the part of LabCorp would be insufficient to form the basis for representation. And what about also, you have the burden of proof on this. Of course we do. We do have the burden of proof. In BB&T, though, there was no evidence that the parties had reached any oral agreement as to what they were trying to accomplish. Maybe you can help me with this. Maybe North Carolina law is different than any law I've ever heard of. But I thought that no matter what your oral negotiations were, once you entered into a contract, that that decided what the party's obligations were. And the prior oral discussion and negotiations were no longer of interest. Now, is there some North Carolina principle that says that's not the case? Yes, there is. And what is that principle? It's in American Potato v. General Brothers, which we cite. I'd also point the court to the West Street. What is the theoretical theory on which this new sui generis, as far as I know, North Carolina provision is? The theoretical principle. It's not actually theoretical. It's in the case law. That where there's allegations of fraud or a mistake. Oh, there's an allegation of fraud? No, or a mistake. Or a mistake. That's exactly what the law says in North Carolina. Lawyer's Title Insurance v. Golf Links, which we cite in our brief, relying on North Carolina state law precedent, specifically holds that parole evidence is admissible to show grounds for reforming an agreement under the doctrine of mutual mistake, even where there's a merger clause in the contract. So you have to demonstrate here there was a mutual mistake? That is correct. And that's the exception to the? That is the exception to the parole evidence rule and to the rule that documents are integrated. But when you then go look at North Carolina law when they are assessing whether there has been a mutual mistake, it doesn't seem that these cases give you any help at all. They have situations very much like this one where they say there is no mutual mistake. Well, I disagree. I think that. Well, I'm thinking of Branch Banking and Apple Tree Ridge Neighborhood Association. So maybe you can, 2010 and 2011 cases. So maybe you can distinguish them for me. Sure. As I was saying before, in Branch Banking, the North Carolina Court of Appeals rejected the mutual mistake defense because the defendant did not cite to any evidence that the parties had a mutual intention that was not included in the deed of trust. The plaintiff also cites Apple Tree Ridge. And again, the mutual mistake doctrine was unavailable because the parties didn't come to any oral agreement regarding the specific purpose. Don't you need an actual pre-contract agreement? I'm sorry? Don't you need an actual pre-contract oral agreement? You do. And in this case, I believe we have the evidence to show that we had a pre-contract oral agreement. As to the intent, but not as to the list. As to the list. You don't contend there was an agreement as to the list? No. There was a mistake as to the list. There was a mistake as to the list. That's what you need. If you said they've substituted the wrong list, here's the list, this was the agreement. Then you'd have a mutual mistake. That's not what happened. I disagree that it has to be that specific. It has to be as specific as the mistake that you're alleging. There's no mutual disagreement that the goal was to give the parties credit for those customers it brought to the table. There's no disagreement there. The level at which you're saying that there's a disagreement is as to the specific names on the list. And if that's the level of granularity at which the mistake was made, then that's the level of granularity at which the mutuality has to occur. That's the whole point of the language in the case law that says some material part of the agreement was inadvertently omitted. There's no contention by the tragic parties that they inadvertently omitted names on the list. And what I would point to this court, I would have this court look at the Lumberman's casualty case, which was decided by the Fourth Circuit in 1996, where there was reformation of an annuity contract on the grounds of mutual mistake despite the fact that there was no evidence that the parties shared a specific intent to name a particular beneficiary. Have you understood Judge Duncan's question? Because I think that really gets to the heart of it. If you were saying, if you had a broader definition of what the mistake was, you might be right. But you don't say that this list was not put there or that there's no disagreement about what the general agreement was to give your client this credit for these preexisting. Your sole issue about the mistake is that not enough people are included here. And therefore, you have to direct yourself to that. Well, perhaps I'm not understanding the question correctly. Well, maybe you can try again. Okay. The agreement and the mutuality of the mistake has to line up. You have to be, the reformation has to mirror the mistake and the mutual mistake. So here, the mutuality of the mistake is the names, the inclusion of names. Or that's the mistake you're alleging, but that's not mutual. Because the Padishka parties do not agree. That's the mechanical mistake in the agreement. That is the mistake that you want to remedy. Because everybody agrees about the intent. Right. But I think the law of mutual mistake is broader than that. Well, I don't think that I did not find a North Carolina case, and I have some familiarity with North Carolina law, that lined up to any extent with the level of detail at which you attempt to reform what you say is a mutual mistake at a different level altogether. Well, again, I think that the three cases that I would rely on, we rely on obviously other cases in our brief, are the Brasnell case, the Lemberman's case, and the A1 pavement marking case. In that case, there was a failure to include, there was an agreement that I believe the buyer would assume all liabilities, ongoing liabilities. And the buyer, there was a dispute then as to what those liabilities were. And the seller said, well, there was a list that was supposed to have been attached to the agreement, and it was inadvertently not attached. The court found that there was an issue of fact there to determine. Well, but that's not your case. Your list was attached. You just don't like the names on it. I think it's a question of degree. And it's your list. It is our list. And as I said, it's a mistake that was made by LabCorp in this instance. But that, under the doctrine of mutual mistake, frankly, It's not mutual. It's not relevant to the issue of mutual mistake. I think, I would expect, obviously, the plaintiffs to argue that, you know, these issues show a lack of error and that, you know, the parties were, you know, that the packing parties had a specific intent. But in this instance, you know, the fact that LabCorp made the error, frankly, under the case law, and I believe it is by clear under North Carolina law, is not relevant. It may be a jury argument to attempt to dissuade the finder of fact and find the mutual mistake. But under the law of North Carolina, that point is not relevant. The negligence by one party doesn't make the mistake unilateral. Thank you. May it please the court. My name is Reed Phillips. And with Joseph Ponzi, I represent Agatepetti Enterprises Incorporated. As you know, this transaction, the discussion about a possible transaction started in 2007. There was a non-binding letter of intent signed in early 2008. There were seven months of negotiations over the terms of the 31-page asset purchase agreement after that, which included the original proposed shared customer list that LabCorp drew from its information, to which we never had access and never saw. There was back and forth about the list, was there not? Right, all kinds of negotiations. All kinds of negotiations. And the list was never intended to be, it's not an exclusive list. Never. And, in fact, there is reference in the APA earn-out provision to certain customers. It was clear from the start that it was never to include all customers. And, in fact, as the record shows from my client's perspective, they were keenly interested in what customers were on that list so they could make their own assessment before ever signing the final agreement as to whether they were likely to achieve the earn-out or not. And my client testified that, you know, they ran some calculations and they were satisfied, based on the list that was attached, that they would make the full earn-out. Otherwise, they were not interested in the deal because they wanted $17 million. There were five components to the earn-out. Each of those, as we point out in the brief and in the record, were heavily negotiated. It resulted in a very precise formula for the calculation of the earn-out. Which became a matter of accounting and math. LabCorp agrees that applying the document as written and signed were entitled to $4 million. But, as you've heard, claims it did not experience the growth that it expected. Now, one thing about the growth, even if you accept the concept that, you know, there was discussion about that, there was increase in revenues from the customers that the packet pennies brought to the deal. What they want to say is, we didn't, LabCorp, didn't have a list that had everybody on it that we wanted on it. We discovered that later. But those customers were customers that were taken away from the growth. In other words, cut out. Those were carved out. The point being that LabCorp did achieve an increase in revenues from the customers that came from the packet pennies. It's just they want to cut out a lot of customers now, after the fact. And those are customers that were never on the list that was shown to the packet pennies and certainly not part of the final deal. The definition of the shared list is that it includes certain customers who were customers of both. It was never intended to be an exhaustive list. Absolutely. That's absolutely correct. Can you tell me, just by way of background, how this all sort of fell apart? I mean, you all negotiated this. It was back and forth. There is the language about, and then you go to collect and all of a sudden... That's right. We signed the deal. We waited until the first... And you've been working together, haven't you? Yes, yes. Mrs. Packet Penny, Dr. Packet Penny was required under her contract that was part of the deal to keep working with the business. Was there some falling out about something else? No. Well, LabCorp also didn't pay a lease, but that's not an issue here that got resolved. Are they in financial trouble? I'm just trying to understand what's going on. No. LabCorp's very healthy according to their publicly filed documents. They have, I think the number is $500 billion a year in revenues. It's a very large company with a large in-house mergers and acquisitions staff that does $200 million in deals every year. The record suggests that when payout time came, what happened is somebody at LabCorp realized that there had been a mistake by LabCorp in creating the list. Isn't that what the record shows? That's exactly what the record shows. And then came, we're not going to pay. We're going to pay nothing. Right. And furthermore, to that point, Your Honor, to this day, nobody at LabCorp has told us on the record who made this so-called mistake, how the mistake was made, any of the details. They just say some names were left off, we want to add those names. And when we do, your payout goes from the $4 million to zero. That's exactly right. So to sum up, there has not been a mutual mistake here. There was a mistake by LabCorp. The reference to growth, which was a general concept at best, is not enough to provide the showing that is required for them to survive summary judgment. Thank you. Thank you. There's a mention that there was an increase in revenues for the customers that the Paddy Parties brought to the deal. I don't believe that's in the record. I don't know that it's actually relevant for purposes of this argument. There was no falling out between the parties. The issue that happened, as it was stated, was that this business actually did not grow. And when LabCorp looked at- But you just told me it didn't make any difference whether it grew or not. Well, I was- It's only irrelevant if it goes back to- No, I think in order to discover how LabCorp learned that there was a mistake, they had a business that did not grow. They then looked at the shared customer list and the customer list and realized that there was an error in the shared customer list. And as a result, they told the Paddy Parties that there was a mistake in the shared customer list. But just because the deal is not profitable to you is not a reason for saying there has been a mutual mistake. It's not because the deal wasn't profitable. That's how the error was discovered. I really don't believe that there's any dispute that the only way the Paddy Parties get the revenue credit, the only way they get the earn out, is if you take customers that LabCorp brought to the deal and give the Paddy Parties earn out credit for that. So, for instance, if the Paddy Parties- I'm putting to record here that you all prepared the list. They got the list. They reviewed the list. They took what you had done and said, okay, that's good by us. You all then made it part of the contract. So by that time, they had concluded that they were going to earn a payout, the earn out. And you all made the assessment that they weren't or not, whatever you made, but they made one judgment. You made another, and that's not a mutual mistake, is it? I think it is because in this instance, the plaintiff's deal lawyer said what we were trying to get at was an accurate shared customer list. That was the intent of the parties, to get at an accurate shared customer list. One side thought it was accurate. The other side thought it wasn't. I don't think the Paddy Parties had any view as to whether or not it was accurate or not. No, they took your word for it. You said this is the list we want. After negotiations, it's okay. The parties agreed on it. And there was an error. How can you even tell us that because, as Judge Duncan has pointed out, the language in the contract says that it includes these things. It doesn't set forth in the contract that these are the only shared businesses, does it? In every case where you have an argument of mutual mistake, there's heavy negotiation over the terms of the agreement. And in every case where you have a claim of mutual mistake, there is a finding, where it's allowed to proceed, that those negotiations did not achieve what the parties intended to accomplish. And I think in order to grant summary judgment for the plaintiff in this case, you have to ignore the factual evidence, including Mr. Cross's testimony, including Dr. Paddy Parties' testimony. Well, you're back to share the intent, and nobody is questioning that. I was wondering, have the Paddy Parties been paid anything for an earn-out? They have not. They have not been paid anything on the earn-out. And do they understand how, or is it clear from the record, that these newfound customers of yours on the shared list would completely negate payout? Yes, it is clear on the record. Mr. Klinke, who is an employee of LabCorp, submitted an affidavit. Is it clear to everyone the precise names that would generate that? We did send them a list of how we came up with the zero payout on the earn-out, and that is in the record. Well, my question was names. Yes, by customer. It is in the record. There is an e-mail exchange. Isn't that quite remarkable, that there are just enough shared customers sitting out there to reduce the payment from several million dollars to absolutely nothing? It actually is so far off the mark. They don't owe you money? No, they don't owe us money. They don't come close to reaching the minimum targets under the earn-out. Thank you. Thank you. Okay, we will come down and greet the lawyers and then go directly to our last case.
judges: Diana Gribbon Motz, Allyson K. Duncan, Robert E. Payne